IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRITISH TELECOMMUNICATIONS PLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civ. No. 10-658-SLR |
| COXCOM, INC.; AND COX COMMUNICATIONS, INC., | ) ) ) ) | |
| Defendants. | ) | |
| COMCAST CABLE COMMUNICATIONS; AND COMCAST CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civ. No. 11-843-SLR |
| BRITISH TELECOMMUNICATIONS PLC, | ) ) ) | |
| Defendant. | ) ) | |

Philip A. Rovner, Esquire and Jonathan A. Choa, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for British Telecommunications plc. Of Counsel: Daniel A. Boehnen, Esquire and Grantland G. Drutchas, Esquire of McDonnell Boehnen Hulbert & Berghoff LLP.

Beth Moskow-Schnoll, Esquire of Ballard Spahr LLP, Wilmington, Delaware. Counsel for Plaintiffs Comcast Cable Communications and Comcast Corporation. Of Counsel: Brian L. Ferrall, Esquire, Leo L. Lam, Esquire, Benedict Y. Hur, Esquire, Ryan K. Wong, Esquire, Nicholas D. Marais, Esquire and Theresa H. Nguyen, Esquire of Keker & Van Nest LLP.

Jack Blumenfeld, Esquire, Rodger Smith II, Esquire, Mary B. Graham, Esquire and Stephen Kraftschik, Esquire of Morris, Nichols, Arsht & Tunnell, LLP, Wilmington,

Delaware. Counsel for Defendants Coxcom, Inc. and Cox Communications, Inc. Of Counsel: John M. DiMatteo, Esquire, Eugene L. Chang, Esquire and Marc E. Montgomery, Esquire of Willkie Farr & Gallagher LLP, and Mitchell G. Stockwell, Esquire and Vanessa M. Blake, Esquire of Kilpatrick Townsend & Stockton LLP.

---

**MEMORANDUM OPINION**

Dated: January 13, 2014
Wilmington, Delaware

ROBINSON) District Judge

## I. INTRODUCTION

On August 5, 2010, British Telecommunications plc ("BT") filed a complaint

against Coxcom, Inc. ("Coxcom"), Cox Communications, Inc. ("Cox Communications")

(collectively, "Cox"), and Cable One, Inc. ("Cable One"),[1] alleging infringement of U.S.

Patent Nos. 5,142,532 ("the '532 patent"), 5,526,350 ("the '350 patent"), 6,538,989 ("the

'989 patent"), and 6,665,264 ("the '264 patent").[2] (D.I. 1) On September 6, 2011, BT

amended its complaint against Cox and Cable One, expanding the infringement to also

cover U.S. Patent Nos. 5,790,643 ("the '643 patent"), 5,923,247 ("the '247 patent"),

6,205,216 ("the '216 patent"), and 6,473,742 ("the '742 patent").[3, 4] (D.I. 66) Two

weeks later, Comcast Cable Communications ("Comcast Cable") and Comcast

Corporation (collectively, "Comcast") filed a complaint alleging invalidity and

noninfringement of those same eight patents.[5] (Civ. No. 11-843, D.I. 1)

Presently before the court are several motions: Cox's motion to strike the

declarations of Dr. Lyon and Dr. Almeroth (D.I. 381); the parties' competing motions for

summary judgment regarding whether Cox's use of Cisco products or combinations

---

[1]Cable One has been dismissed by stipulation. (D.I. 239 as ordered by the court)

[2]All citations are to Civ. No. 10-658, unless otherwise indicated.

[3]The '643 patent is no longer at issue. (D.I. 282 as ordered by the court)

[4]Cox argues that any infringement is covered by a license between BT and Cisco Systems, Inc. ("Cisco") , or in the alternative, that it does not infringe. The licensing issue is addressed herein.

[5]The court later denied BT's motion to add Comcast to the Cox case. (Oral Order by Judge Sue L. Robinson on March 12, 2012) The '216 and '264 patents will be addressed separately. (Civ. No. 11-843, D.I. 155)

thereof is licensed (D.I. 314; D.I. 352); BT's motion to dismiss Cox's counterclaim for breach of contract (D.I. 343); the parties' competing motions as to Cox's affirmative defense of patent exhaustion (D.I. 317; D.I. 349); and BT's motion for summary judgment regarding Cox's affirmative defense of estoppel (D.I. 340). The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."

2

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## III. MOTION TO EXCLUDE

BT's experts, Dr. Almeroth and Dr. Lyon, issued their opening expert reports on March 8, 2013 and March 11, 2013 respectively, neither of which discussed the licensing issues or any "substantial non-infringing uses" of the accused devices in Cox's network. (D.I. 313, exs. 3, 4) On April 25, 2013, Cox's expert, Dr. Evans, issued his rebuttal expert report stating that the accused products "have no known usage that is

3

divorced from the functionality that [BT] alleges as constituting [certain claim limitations]." (D.I. 381, ex. 4 at ¶¶ 208, 225, 239, 269, 344, 362) On May 17, 2013, Dr. Lyon and Dr. Almeroth issued their reply reports providing that the Cisco products, including "CMSs, CMTSs, and EMTAs have known, actual, and substantial uses that do not infringe the asserted claims" and giving some general examples thereof. (D.I. 381, ex. 7 at ¶¶ 88-91; ex. 8 at ¶¶ 55-57)

Thereafter, BT submitted Dr. Almeroth's and Dr. Lyon's declarations to support its argument that the Cisco products (routers, switches, CMTSs, EMTAs, CMSs) have substantial non-infringing uses. (D.I. 355, exs. I, J) The declarations paralleled the reply reports, but provided additional examples of non-infringing uses, some conclusory explanations, and comparisons to claim limitations. Evidence appropriate for review on summary judgment is that which has been vetted through discovery and issues of fact are raised by conflicting evidence, not by attorney argument or conclusory expert opinions. As such, the court grants Cox's motion to strike portions of the declarations of Dr. Lyon and Dr. Almeroth. (D.I. 381)

## IV. LICENSES

New York law governs the asserted licensing issues. (D.I. 316, ex. 1 at § 5.11; D.I. 355, ex. F at § 6.8) Under New York law, a contract should be construed so as "to give effect to the intent of the parties as revealed by the language" of the contract itself. *Bolt Electric, Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000). The court should endeavor "to interpret the language of the contract in a practical manner such that the parties' reasonable expectations will be realized." *Gillman v. O'Connell*, 176 A.D.2d 305, 307 (N.Y. App. Div. 1991). To that end, "[i]t is incumbent on the court,

4

when interpreting a contract, to give the words and phrases contained therein their ordinary, plain meaning." *Matter of Wallace v. 600 Partners Co.*, 205 A.D.2d 202, 208 (N.Y. App. Div. 1994), aff'd, 86 N.Y.2d 543 (N.Y. 1995).

The threshold question in contract interpretation is whether the contract is ambiguous. Under New York law, "the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 516 (2d Cir. 2001) (internal quotation marks and citations omitted). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). "[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 278 (N.Y. 2005) (internal quotation marks and citations omitted). A court weighing competing contract interpretations "must look to all corners of the document[,] rather than view[ing] sentences or clauses in isolation." *Int'l Klafter Co. v. Continental Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (internal quotation marks and citations omitted); *accord Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (N.Y. 2009) (noting that "particular words should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties as manifested thereby," ensuring that "[f]orm [does] not prevail over substance") (internal quotation marks and citations omitted).

If language of a contract is ambiguous, then the differing interpretations of the contract generally present a triable issue of fact. *Golden Pac. Bancorp*, 273 F.3d at 515; *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). In contrast, "[w]here a contract is unambiguous, that is, where its words convey a definite and precise meaning upon which reasonable minds could not differ, its interpretation can be determined as a matter of law." *Bolt Electric*, 223 F.3d at 150; *accord Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("[I]f a contract is straightforward and unambiguous, its interpretation presents a question of law for the court ....") (internal quotation marks and citations omitted).

### A. The BT-Cisco License

On March 18, 2005, Cisco and BT entered a "Patent Cross-License Agreement" ("BT-Cisco license") granting cross-licenses under any patent claim of a "licensed patent" for combinations of Cisco products and other items. (D.I. 316, ex. 1)  The patents BT asserts against Cox are covered by the BT-Cisco license. In § 2.1 of said license, BT grants certain rights to Cisco, namely to use Cisco licensed products, including IH Products (made by third parties).[6]  The BT-Cisco license defines an "Authorized Third Party" as

> a third party, including, without limitation, a manufacturer (including original equipment manufacturer (OEM)),

---

[6]IH Product is defined as "[a]ny instrumentality or aggregate of instrumentalities which can compute, classify, . . . switch, route, store,. . . or utilize any form of information, intelligence or data . . . for business, scientific, control, personal, home or other purposes ("Information Handling System")" and "[a]ny instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in or use with an Information Handling System." (§ 1.9)

6

> assembler, replicator, integrator, distributor, reseller
> (including value-added reseller (VAR)), **customer or user,
> that is authorized by a Party or Affiliates to exercise any
> legal rights with respect to a Licensed Product of such
> Party or its Affiliates**, including without limitation making,
> using, selling, leasing (including licensing of software),
> offering for sale, importing, distributing or otherwise
> transferring such product either alone or in combination with
> other products.

(§ 1.3) (emphasis added)  The BT-Cisco license allows Authorized Third Parties to

claim the benefits of the license "only where such acts are done for or on behalf of, or

otherwise authorized by [Cisco]."  (§ 2.11)

Cox asserts that it is an Authorized Third Party and, as such, should reap the

same benefits as Cisco under the BT-Cisco license.  Cox points to BT's answer

regarding Cox's breach of contract allegations, where "BT admits that Cox is an

Authorized Third Party with respect to deployment and use of Cisco products, but BT

denies that Cox ever sought or Cisco ever authorized Cox to file an affirmative claim for

breach of contract."  (D.I. 258 at 6)  BT also

> denied that Section 2.11 gives Cox any rights with respect to
> combinations incorporating Acquired Products beyond the
> limited rights established by Section 2.3.  The [BT-]Cisco
> License provides that Cisco may authorize certain third
> parties to undertake certain actions under the license.  In no
> event, however, does any provision give third parties who
> purchase and use Cisco equipment the right to file a claim
> for breach of contract without specific authorization from
> Cisco.

(*Id.* at 7)  Cox has not demonstrated that it "is authorized by [Cisco] to exercise any

legal rights" under § 1.3, or that it is acting on behalf of Cisco under § 2.11.[7]  Instead,

---

[7]Common sense counsels against allowing Cox to stand in Cisco's shoes, based
on the use of one Cisco component in Cox's network.  Further, such a result runs

Cox is a Cisco customer and, as such, the court concludes that any combinations of third party products with Cisco Licensed Products used by Cox are controlled by § 2.3, which recites in part:

> Notwithstanding anything to the contrary in Section 2 of this License Agreement, third parties . . . who obtain a Licensed Product (directly or indirectly) from a Party or its Affiliate ("Acquired Item") shall . . . be licensed under any patent claim . . . of a Licensed Patent covering the combinations set forth below for making, using, selling, offering for sale, leasing (including licensing of software), importing, distributing, or otherwise transferring such combinations.

(§ 2.3)

In this regard, § 2.3(a) applies to "a combination of Acquired Items," which are "Licensed Product[s obtained] (directly or indirectly) from a Party or its Affiliate." (§ 2.3) While Cox argues that it "does source HFC network components from Cisco," Cox does not argue that the products making up an entire combination (or network) are obtained from Cisco. Therefore, the court concludes that the combinations are not licensed under § 2.3(a).

Section 2.3(b) licences combinations "of one or more Acquired Items with one or more other items." Specifically, § 2.3(b)(i)(A) covers situations where the use "of one or more Acquired Items" would directly infringe. Cox has not presented evidence that any of its combinations meet this requirement.[8]

---

counter to § 2.15 stating that the license cannot be used "in a manner that is a sham merely to permit a third party to circumvent the other Party's patent rights." (§ 2.15)

[8]Instead, Cox argues for an interpretation of this section which disregards the language "with one or more other items" and distorts the plain and ordinary meaning of the contract language. (D.I. 383 at 13-14)

8

Section 2.3(b)(i)(B) applies to situations where the use "of one or more Acquired Items" would constitute contributory infringement.  To apply this section, Cox must establish that the Cisco products have no substantial non-infringing uses and are not staple articles of commerce.  35 U.S.C. §271(c).  To determine whether a product has substantial non-infringing uses, the Federal Circuit looks to whether the product "contain[s] specialized, distinct components that could be used only to infringe." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1339 (Fed. Cir. 2008); *see also*, *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010) (the court "must only consider the 'particular tool' in question when that tool is a 'separate and distinct feature' of a larger product.").  As more fully explained in the section on patent exhaustion below, BT avers that each Cisco product may be used in a non-infringing fashion to provide voice or data services.  (D.I. 353 at 12-13; D.I. 396, ex. 14 at ¶¶ 56-57)  Cox relies on its expert's report to conclude that the Cisco products have no substantial non-infringing uses.  However, these excerpts contain conclusory opinions,[9]

_____

[9]For example, Dr. Evans' report states:

> The components that purportedly perform the accused functionality in a Cisco CMTS have no known usage that is divorced from the functionality that Dr. Lyon alleges as constituting "interrogating stations and enforcing allocation thereto to ensure each station's minimum bandwidth requirements is fulfilled" and such components are implemented only when performing the accused services.  It is an essential function of the CMTS components to control a broadband network including the communications between cable modems and/or EMTAs and itself, and it would make no sense to purchase or deploy a CMTS that did not perform the functionality BT accuses for this claim element.

(D.I. 383, ex. 11 at ¶ 120)

without analysis or reliance on evidence.  Moreover, Cox does not explain how the

Cisco products contain "separate and distinct features" capable of the infringing uses.

(D.I. 383 at 14-15 & exs. 11-13)  The court concludes that there exists a genuine issue

of material fact as to whether the accused Cisco products are capable of non-infringing

uses.

Section 2.3(b)(i)(C) applies to situations where "the sale, use or combination of

one or more Acquired Items" would constitute "inducement of infringement . . . but only

with respect to those entities that are induced through acts by or on behalf of" Cisco.

To establish active inducement of infringement, a patent owner must show that an

accused infringer "knew or should have known [their] actions would induce actual

infringements." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir.

2006).  Cox has not identified any "sale, use or combination" of Cisco products that

would constitute inducement of infringement by Cisco.  The court finds BT's argument

more persuasive, that is, that Cisco is not inducing Cox to infringe when Cox

"mandate[s] that Cisco and other suppliers provide products with features that Cox uses

to infringe."  (D.I. 353 at 15; D.I. 315 at 18)

Section 2.3(c) requires that Cisco provide a written indemnity "with respect to

infringement of third party patent rights arising from the sale or use of such

combination" and that the claim for patent infringement against Cox "gives rise to a

claim against [Cisco] hereto being called to provide that [i]ndemnity cover."  As

evidence of indemnification, Cox points to a license between Cox and Cisco ("the Cox-

Cisco license") as providing Cox "broad coverage over any indemnity claim, but having

exceptions for infringement claims depending on combinations of Cisco and third party

equipment that result in Cisco only being liable for its proportional share – compared to Cox's other vendors -- of the overall claim." (D.I. 383 at 19; ex. 8 at ¶¶ 13-18; ex. 9 at 30:15-33:24, 58:15-62:3) A declaration from Cox's representative relies on representations by Cisco in correspondence, whereby Cisco deemed it unnecessary to indemnify Cox as Cisco was licensed to the patents-in-suit. (D.I. 383, ex. 8 at ¶¶ 13-18 & exs. B, C) BT points to the same section of the Cox-Cisco license and argues that Cox's assertion is contradicted by the plain language of the license, which provides that Cox will be responsible for claims "arising from . . . the combination, operation, or use of a Product supplied under this Agreement with any product, device or software not supplied by Cisco." (D.I. 408 at 13; D.I. 383, ex. 8 at ¶ 14) The plain language of the Cox-Cisco license requires Cox to procure a written indemnification to cover an infringing combination. Cox has not done so and has not proffered specific evidence to demonstrate that Cisco is indemnifying Cox for the accused combinations as required by both the BT-Cisco and the Cox-Cisco licenses. The court concludes that there is a genuine issue of material fact as to whether Cox is licensed under § 2.3(c).

Finally, Cox avers that it received an implied license to use Cisco products in combination with non-Cisco equipment to practice the licensed patents. The sale of a non-patented product by a licensee may carry with it an implied license, where (1) the equipment involved has no non-infringing uses and (2) the circumstances must "plainly indicate that the grant of a license should be inferred." *Zenith Elecs. Corp. v. PDI Commc'n, Sys., Inc.*, 522 F.3d 1348, 1360 (Fed. Cir. 2008). As discussed above, there exists a genuine issue of material fact as to whether the Cisco products have non-infringing uses. The BT-Cisco license contains a number of restrictions, including

11

limiting the use of combinations to those covered in § 2.3, the prohibition on any action that would "permit a third party to circumvent the other Party's patent rights" in §2.15, and the express prohibition of any implied license under § 5.4(f)(4). As additional evidence will not allow Cox to show that the BT-Cisco license "plainly indicate[s] that the grant of a license should be inferred," the court concludes that no implied license exists.

### B. The BT-Intel License

Intel is authorized to make, use or sell the PUMA chipsets, pursuant to the BT-Intel license. (D.I. 355, ex. F at § 3.1) Cox avers that there are no non-infringing uses for the EMTAs with PUMA chipsets and that the grant of a license should be inferred. *Zenith*, 522 F.3d at 1360. As previously discussed, there exists a genuine issue of material fact as to whether the EMTAs have non-infringing uses. Moreover, the BT-Intel license contains restrictions, including specifically precluding the conferring of any implied license. (§ 5.1) Therefore, the court concludes that the circumstances do not "plainly indicate that the grant of a license should be inferred." Cox's motion in this regard is denied.[10] *Zenith*, 522 F.3d at 1360.

### D. Cox's Breach of Contract Counterclaim

Cox argues that it is an Authorized Third Party and that the BT-Cisco license expressly provides Cox affirmative rights "under the same scope as the licenses, rights, releases, covenants and immunities granted to the Parties in th[e] License Agreement." (§ 2.11; D.I. 385 at 8-9) To this end, Cox alleges that BT breached the BT-Cisco license "by accusing licensed combinations of Cisco and non-Cisco equipment in Cox's

---

[10]As Cox does not address BT's arguments regarding the grant of an express license, the court grants summary judgment on this issue.

12

networks in violation of that agreement." (D.I. 385 at 1)  Assuming arguendo that Cox

has the same rights as Cisco under the BT-Cisco license, the BT-Cisco license requires

a particular course of conduct for dispute resolution, including meetings between senior

management and mediation.  (§ 5.26)  Cox has not taken any of these steps and,

therefore, the court concludes that Cox cannot properly maintain its breach of contract

counterclaim in this litigation.  To allow Cox to proceed directly to litigation would

eviscerate a section of the BT-Cisco license and give Cox more rights than the actual

parties to the contract.  *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S.

362, 375 (1990) ("third-party beneficiaries generally have no greater rights in a contract

than does the promisee."); *Manley v. AmBase Corp.*, 337 F.3d 237,250 (2d Cir.2003)

(citing *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("New York law ... disfavors

interpretations that render contract provisions meaningless or superfluous.").

## V. PATENT EXHAUSTION

Cox has moved for summary judgment that BT is precluded from asserting any

claim for infringement of the '989 patent because BT has exhausted its patent rights.

BT cross-moved for summary judgment that BT's patent rights are not exhausted as to

the sale of Cisco, Intel or Juniper products as used by Cox in any accused combination

for each of the patents-in-suit.  "The longstanding doctrine of patent exhaustion

provides that the initial authorized sale of a patented item terminates all patent rights to

that item." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).

"The authorized sale of an article that substantially embodies a patent exhausts the

patent holder's rights and prevents the patent holder from invoking patent law to control

postsale use of the article." *Id.* at 638.  An article substantially embodies a patent when the article has "no reasonable noninfringing use and include[s] all the inventive aspects of the patented methods." *Id.*

## A. The '989 Patent and the '350 Patent

Intel is authorized to make, use or sell the PUMA chipsets, pursuant to the BT-Intel license.  (D.I. 355, ex. F at § 3.1)  Contrary to BT's argument, the plain language of the contract restricts Intel's business activities, not Intel's making and selling of chipsets.  Specifically, Intel has no "licenses [sic] rights . . . under the BT patents in respect of BT Proprietary Services," which are defined as "any public or private voice telecommunications services and internet access services provided directly to end user households and/or business . . . ." (§§ 1.4, 3.9)  For the purposes of analyzing Cox's patent exhaustion defense, the court concludes that Intel's sale of PUMA chipsets to Cox was authorized.[11]  The parties agree that the sales of the Cisco and Juniper products were authorized by BT under those respective licenses.  (D.I. 350 at 5; D.I. 388 at 4)

BT's experts offer opinions that there are non-infringing uses of each of the accused products.  For the '989 patent, Dr. Lyon opines that

> some subscribers who purchase both voice and data
> services from Cox receive their data service through a cable
> modem and their voice service through a separate EMTA.

---

[11]The parties agree that in 2010, Intel acquired a division of Texas Instruments that designs, manufactures, and sells PUMA chipsets.  (D.I. 318 at 1; D.I. 350 at 14) The BT-Intel license contains provisions releasing Intel and its future subsidiaries from liability for past infringement.  (§§ 1.8, 2.1)  The court does not reach BT's arguments regarding any sales of PUMA chips by Texas Instruments.  If BT prevails on its infringement arguments, the parties may brief the issue as it pertains to damages.

> In such configurations, the EMTA deployed at the
> subscriber's home or business does not perform at least the
> [following steps of] claim 13 [of the '989 patent] . . . .

(D.I. 381, ex. 7 at ¶ 91; D.I. 355, ex. L at 73:24-75:1)

> [I]n some markets, Cox provides (i) voice services to
> subscribers via an Arris Cornerstone Voice Host Digital
> Terminal (HDT) and (ii) Internet data services to subscribers
> via a Cisco CMTS.  In such combinations, the Cisco CMTS
> does not perform the [determining bandwidth] step [of claim
> 13 of the '989 patent] for at least the reason that, in such
> configurations, Cox is not using the CMTS to provide voice
> service.

(D.I. 381, ex. 7 at ¶ 90; D.I. 355, ex. K at 152:10-155:1)

> Cisco CMSs can be used to provide traditional circuit-
> switched voice service via Digital Loop Carriers (DLCs)
> similar to [the] way that many Regional Bell Operating
> Companies (RBOCs) and Independent Operating
> Companies (IOCs) provide voice services with CMSs and
> DLCs still today.  In such a configuration, the Cisco CMS
> would not perform the [determining bandwidth] step [of claim
> 13 of the '989 patent] for at least the reason that
> circuit-switched voice provided via DLCs is not in the form of
> "packet flows."

(D.I. 381, ex. 7 at ¶ 89)  For the '350 patent, Dr. Almeroth opines:

> Routers and switches, including the ones manufactured by
> Cisco, have a wide range of uses that do not infringe the
> asserted claims of the '350 patent. While I have identified
> certain routers and switches that perform one or more steps
> of the asserted claims, Cox's network has many other
> routers and switches that do not perform steps of the
> asserted claims.

(D.I 381, ex. 8 at ¶ 55)  The experts do not provide further analysis as to why the claim

limitations are not met.

    In response, Cox points to equally conclusory opinions from its expert's report.

For example:

> The components that purportedly perform the accused
> functionality in Cisco EMTAs, CMTSs and CMSs (deployed
> by Cox) have no known usage divorced from the
> functionality that Dr. Lyon alleges as constituting [the
> determining bandwidth step of claim 13 of the '989 patent]
> and such components are implemented only when
> performing the accused services. It is an essential function
> of certain components of the Cisco EMTAs, CMTSs and
> CMSs to control a broadband network including the
> communications between EMTAs and CMTS, and it would
> make no sense to purchase or deploy . . . EMTAs, CMTSs
> and CMSs that did not perform the functionality Dr. Lyon
> accuses for this claim element.

(D.I. 381, ex. 4 at ¶ 344) With the lack of analysis as to how a particular product does

or does not meet the claim limitations, the court concludes that neither party has offered

sufficient evidence on non-infringing uses.

Neither did the parties' experts directly address the issue of whether the accused

products "include all the inventive aspects of the patented methods." Cox argues that

BT's expert, Dr. Lyon, relied on a technical document for a specific PUMA chipset,

which stated that the PUMA "MAP processor" is "the heart of the DOCSIS Cable

Modem Block (DCMB) data flow." (DI 313, ex. 3 at ¶¶ 266, 293, 302, 326, 386, 418)

Further, for claim 13 of the '989 patent, only the "determining bandwidth" step is not

performed solely by the PUMA chipset. (D.I. 350 at 11-12; D.I. 319, ex. 3 at ¶¶ 310,

424 (EMTAs perform the "directing packets" step)) The "determining bandwidth" step is

present in the prior art, therefore (according to Cox), this step cannot be an "inventive

aspect" of the '989 patent. Cox's expert explained that "[i]t is an essential function of

certain components of the Cisco EMTAs to control packets relating to voice and other

data in the form of Internet Protocol packets, and it would make no sense to purchase

or to deploy a Cisco EMTA that did not perform the functionality that Dr. Lyon accuses

for this claim." (Dl 383, ex. 11 at ¶¶ 267-69)

BT's expert explained that the "determining bandwidth" step is met only by a combination of products, including the EMTA. (D.I. 389, ex. 14 at ¶¶ 307-310) Therefore, BT responds that "none of the Cisco, Intel or Juniper products at issue embody all of the essential features of the invention by practicing all the inventive aspects of the claims." (D.I. 350 at 11) Once again, the court is left with a battle of the experts, with neither expert sufficiently analyzing the issue at hand in a helpful manner. The court concludes that Cox has not presented sufficient evidence to meet its burden of showing that the PUMA chipset includes the inventive aspects of the '989 patent.

With respect to the '350 patent, BT argues that the "allocating bandwidth" limitation is performed by Cisco's CMTSs. The inventor, Mr. Gittins, testified that "allocating bandwidth to particular types of traffic in response to customer demand" was the only claim limitation not in the prior art, and that **the combination** of this limitation with the other steps in the claim was the inventive contribution. (D.I. 293, ex. 3 at 19:13-25) Cox does not explain (other than through conclusory attorney argument) how the absence of the "allocating bandwidth" limitation in the prior art evidences that the CMTS includes the inventive aspects of the asserted claims.

The court denies Cox's motion for summary judgment. On the other hand, Cox has offered enough evidence to create a genuine issue of material fact with respect to the '989 and '350 patents. Therefore, the court also denies BT's cross-motion for summary judgment on these patents.

**B. The '247, '532, and '742 Patents**

17

BT avers that "[e]ach of the Cisco, Intel and Juniper products in the Accused Third Party Combinations have reasonable non-infringing uses with respect to each of the patents in suit" and provides three citations in support. (D.I. 350 at 6 (citing D.I. 355, exs. D, I, J)) BT provides a table listing non-infringing uses for each of the patents-in-suit. (D.I. 355, ex. D) However, for the '532 and '742 patents, the table states (without evidentiary support) that the accused products "have no non-infringing use, including reasonable or substantial" non-infringing uses. (*Id.* at 8-10) For the '247 patent, the table states (without evidentiary support) "Cisco and Non-Cisco CMTSs monitor the systems, but such monitoring is performed for noninfringing reasons as well." (*Id.* at 11) The other two citations are to the stricken expert declarations, which specifically offer opinions regarding non-infringing uses of the '989 and '350 patents. (D.I. 355, exs. I, J) BT also argues that "none of the Cisco, Intel or Juniper products at issue embody all of the essential features of the invention by practicing all the inventive aspects of the claims," relying on the same three citations, along with three additional citations. (D.I. 350 at 11 (citing D.I. 355, exs. A-D, I, J) The three citations discussed above provide no support for BT's conclusion. (D.I. 355, exs. D, I, J) The three additional citations simply set out the accused combinations of products, but provide no analysis of any issue. (D.I. 355, exs. A-C) BT offers no further explanation or analysis.

Opposing BT's cross-motion, Cox maintains that it "has presented evidence upon which a fact finder should be allowed to find on this evidence exhaustion as to BT's claims of infringement under the '247, '532, and '742 patents against the respective asserted devices." (D.I. 388 at 1 (citing D.I. 383, ex. 11 at LA0125-146, ex. 12 at LA0147-151, ex. 13 at LA0152-153)) In support of the lack of non-infringing uses,

18

Cox's expert, Dr. Evans, opines that the accused products "have no known usage that is divorced from the functionality that Dr. Lyon alleges as constituting [the controlling a bidirectional broadband step of the '532 patent]." (D.I. 383, ex. 11 at ¶ 62; *see also supra* note 9)  Dr. Madisetti offers opinions regarding the invalidity of the '247 patent and Mr. Wechselberger regarding Cox's non-infringement of the '742 patent; neither of these reports analyze the lack of non-infringing uses.  (D.I. 383, ex. 12 at LA0147-151, ex. 13 at LA0152-153)  Neither do any of the experts analyze the issue of whether the accused products include the inventive aspect of the three patents at issue.  BT's motion for summary judgment is denied, as neither party has offered sufficient evidence for the court to evaluate the issue of patent exhaustion.[12]

## V. EQUITABLE ESTOPPEL

In order to establish equitable estoppel, defendant must show: (1) plaintiff, through misleading words, conduct, or silence, led defendant to reasonably infer that plaintiff did not intend to enforce its patent against it; (2) defendant relied on that conduct; and (3) due to its reliance, defendant will be materially prejudiced if plaintiff is allowed to proceed with its claim. *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiffs known acquiescence" that defendant can continue its allegedly infringing activities. *Id.* at 1043-44. "Delay in filing

---

[12]While the court denies BT's motion for summary judgment, it does not conclude that Cox has shown sufficient evidence to move forward with a patent exhaustion defense at trial.  Cox will be required to make a proffer of evidence before it will be permitted to present the issue at trial.

19

suit may be evidence which influences the assessment of whether the patentee's conduct is misleading but it is not a requirement of equitable estoppel. Even where such delay is present, the concepts of equitable estoppel and laches are distinct from one another." *Id.* at 1042.

As with the motion to exclude discussed above, evidence must be vetted through discovery before parties rely on it for summary judgment motions. Cox initially supported its affirmative defense of estoppel as follows: Cox provided the filing and the issue dates of the patents-in-suit, and a series of dates and activities regarding BT's conduct. (D.I. 342, ex. B; D.I. 49 at 2-5) With respect to the '350, '989, and '532 patents, Cox stated that accused products "were publicly available at least as early as 2004," BT "had actual knowledge of" the products in July 2006, and that "BT approached Cox [regarding these patents] in July 2006." (D.I. 342, ex. B) With respect to the '247 patent, Cox stated that it "deployed the NetCool application in early 2000" and that "the use of NetCool . . . was generally known since at least 2002." (*Id.*) With respect to the '742 patent, Cox stated that "BT knew or should have known that all settop boxes were required to have a replaceable security module (i.e. CableCard) as of July 1, 2007, per the FCC 'integration ban'." (*Id.*) Cox concludes that BT unreasonably delayed in asserting infringement of the patents-in-suit from four to ten years. (*Id.*)

Rather than rely on the above arguments discussed in discovery, Cox now points to other evidence (some of which it used in its licensing briefing). Even considering the

additional evidence to the extent it was disclosed in the licensing briefing,[13] Cox fails to meet its burden of proof. Cox asserts that BT represented that its infringement contentions did not relate to Cisco or Cisco products. Cox argues that in reliance on these representations, Cox decided not to initially assert a BT-Cisco license defense and "purchased tens of million of dollars of Cisco equipment and related services each year" from 2006 to 2010, without seeking further indemnification from Cisco. Other than attorney argument, Cox has not offered evidence to support this assertion. (D.I. 384 at 8; D.I. 383, ex. 8 at ¶ 9)

## VI. CONCLUSION

For the foregoing reasons, Cox's motion to strike the declarations of Dr. Lyon and Dr. Almeroth (D.I. 381) is granted. The parties' competing motions for summary judgment regarding whether Cox's use of Cisco products or combinations thereof is licensed (D.I. 314; D.I. 352) are granted in part and denied in part. BT's motion to dismiss Cox's counterclaim for breach of contract (D.I. 343) is granted. The parties' competing motions as to Cox's affirmative defense of patent exhaustion (D.I. 317; D.I. 349) are denied. BT's motion for summary judgment regarding Cox's affirmative defense of estoppel (D.I. 340) is granted.

_____

[13]Cox had a duty to amend its discovery responses when "in some material respect the disclosure or response is incomplete or incorrect. . . ." Fed. R. Civ. P. 26(e)(1). Courts consider four factors in determining whether a party has breached its duty to amend a discovery response under Rule 26(e)(1): (1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the party knew that the response was incomplete; and (4) whether the corrective information was otherwise made known to the other party through the discovery process or in writing. *Lab. Skin Care, Inc. v. Limited Brands, Inc.*, 661 F. Supp. 2d 473, 476-477 (D. Del. 2009).

21